221 So.2d 859 (1969)
Robert GRAY, Individually, et al.
v.
Gerald Bert NATHAN et al.
No. 7613.
Court of Appeal of Louisiana, First Circuit.
April 14, 1969.
*860 Curtis R. Boisfontaine, of Sessions, Fishman, Rosenson, Snellings & Boisfontaine, New Orleans, for Gerald Bert Nathan, Julian Hillard, Individually d/b/a Julian Hillard Leasing Co. and Hillard Leasing Co. Inc., and United States Fire Ins. Co., defendants-appellants.
Herman S. Kohlman, New Orleans, for Gerald Bert Nathan, individually, defendant and third party plaintiff-appellant.
Robert A. Hawthorne, Jr., of Sanders, Miller, Downing & Kean, Baton Rouge, for Anthony J. Brady and Audubon Ins. Co., defendants-appellees.
Rodney P. Woods, Jr., Lutcher, for Anthony J. Brady.
Lawrance A. Uter and Arnold J. Gibbs, Baton Rouge, for Robert Gray, and others, Bessie Hendricks Brandon, and others, and Charley Gray, and others, plaintiffs-appellees.
Calvin E. Hardin, Jr., of Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, for Indiana Lumbermans Mutual Ins. Co., defendant-appellee.
Nesom, Mellon, Tillery & Cavanaugh, Denham Springs, for Edward Perriloux, plaintiff-appellee.
*861 Edward M. Callaway, Baton Rouge, for Motors Insurance Corp. subrogated in the Estate of Dave Brandon and Charley Gray plaintiffs-appellees.
Before LOTTINGER, ELLIS and BAILES, JJ.
LOTTINGER, Judge.
This is a suit for personal injuries and property damages resulting from a multi-automobile accident. Petitioners in this suit are Robert Gray, who sues individually and for and on behalf of his minor son, Lee Royal Gray; Lugine Gray; Charley Gray; Izell Schelvin; Leonard Augillard; and Arthur Washington, individually and for and on behalf of his minor son, Eddie Washington. The defendants are Gerald Bert Nathan, who was driving a 1964 model Cadillac automobile at the time of the fatal accident, Julian Hillard, individually and doing business as Julian Hillard Leasing Company and/or Hillard Leasing Company, the owner of the said automobile, Nordis of Dallas, Incorporated and/or Nordis Sports Wear, Inc., the alleged employer of Gerald Bert Nathan at the time of the accident, United States First Insurance Company, the insurer of the 1964 Cadillac automobile which Mr. Nathan was driving at the time of the accident, Anthony Joachin Brady, who was operating his 1960 model Chevrolet automobile at the time of the accident and his liability insurer, Audubon Insurance Company. After trial on the merits below, the Lower Court awarded judgments, in various amounts, in favor of the petitioners and against the defendants, Gerald Bert Nathan, Julian Hillard, individually and d/b/a Julian Hillard Leasing Company and Hillard Leasing Company, Inc., and the United States Fire Insurance Company, jointly and in solido. The defendants have taken an appeal, and plaintiffs have answered the appeals seeking an increase in quantum.
For the purposes of trial below, the instant case was consolidated with Suit No. 7614 entitled Brandon, et al. v. Nathan, et al., La.App., 221 So.2d 869, and Suit No. 7615 Gray et al. v. Nathan, et al., La.App., 221 So.2d 870. Although one opinion was rendered by the Lower Court covering all three law suits, separate judgments were rendered in each individual suit.
We quote from the reasons for judgment on the issue of liability as rendered by the Lower Court, as follows:
"According to the evidence presented, Gerald B. Nathan, prior to the accident, was driving a 1964 Cadillac in a Southerly direction towards New Orleans on the Airline Highway (U.S. 61). At a point approximately one-half of a mile north of Kenner, his automobile crossed from the inside lane for southbound traffic, across the median strip and into the northbound traffic lane resulting in this catastrophic accident. Best estimates showed that the accident occurred about 4:15 P.M. In the area where the accident occurred, the highway is a blanktopped road of four lanes with a narrow unpaved median strip between the north and southbound traffic lanes. There is no existing guard rail between the two paved roadways and the respective lane markings are not well identified. Apparently there were grey, leaden skies and a misting rain prevailing at the time creating wet pavements with occasional standing puddles of water.
"State Police investigation of the accident revealed that six cars were described as involved in the accident, five of which sustained damage. For purposes of simplicity the cars have been described numerically as they were in the police report with the make and driver's names listed in the respective order.
"Car No. 1  1964 Cadillac Driven by
 Gerald Nathan
"Car No. 2  1959 Plymouth driven by
 Dave Brandon, Jr.
"Car No. 3  1955 Ford driven by Lugine
 Gray
*862
"Car No. 4  1952 Ford driven by Edward
 Perrilloux
"Car No. 5  1960 Volkswagon driven by
 James K. Ragland
"Car No. 6  1960 Chevrolet driven by
 Anthony J. Brady
"Despite the fact that there were some 17 occupants of the six cars listed in the police report, only four of these, together with investigating officer, offered substantial testimony in assisting a reconstruction of the accident. However, it appears that with the exception of the Brady automobile, the movements of the other cars before and after the collisions are generally undisputed.
"The sequence of events indicates that after Nathan's car crossed the median strip it struck the Brandon vehicle headon which was in the inside of the two northbound traffic lanes. The impact of this collision thrust the Brandon car into the outside lane where it was struck by the Gray vehicle which it had passed a short distance before. The Brandon car finally came to rest on the shoulder of the road, while the Gray car stopped on the inside lane of the northbound traffic lane. Both of these cars were facing south, being the opposite direction from which they had originally been traveling. It appears that a 1952 Ford driven by Edward Perrilloux had been following behind the Gray and Brandon cars in the northbound lane, and being suddenly confronted with the pile up in front of him, he swerved across the road and median strip into the path of James Ragland's Volkswagon in the extreme outside portion of the southbound traffic lane. Despite Nathan's testimony to the contrary, the evidence indicates that Ragland's Volkswagon was some 60 to 80 yards behind Nathan's car when Nathan's car crossed the median strip. Whereas the first three vehicles described were destroyed, the damages to the Perrilloux and Ragland cars were moderate in nature.
"Captain Roland Cappola of the Louisiana State Police, who investigated the accident, said that he included a sixth car in his report being the Chevrolet driven by Anthony J. Brady. He admitted that subsequent inquiry revealed there was insufficient evidence to show contact between the Brady and Nathan cars; however, he said he included the Brady automobile in the report because of a statement of one of the drivers.
"Although there were numerous witnesses called and the trial consumed the better part of five days, the question as to liability can be limited to one issue. The crux of this case simply stated is whether there was any action on the part of Anthony J. Brady which precipitated and caused Gerald B. Nathan to lose control over his car thus resulting in the multicar collision. If there is insufficient evidence indicating Brady's participation then it must be presumed that Nathan was negligent by being in the wrong lane, and he and his insurers should be held responsible for the damages arising therefrom. Laughlin v. Allstate Insurance Co. [La.App.], 169 So.2d 396; Brown v. Southern Farm Casualty Insurance Company [248 La. 943], 183 So.2d 313. On the other hand, if there is sufficient evidence reflecting fault on the part of Brady creating this tragic sequence of events, Brady should be charged with the consequences of his act.
"As correctly stated by counsel for defendant, United States Fire Insurance Company, only five people gave testimony concerning the actual facts of the accident. Those people were Gerald B. Nathan, Mr. and Mrs. Anthony J. Brady, James H. Ragland and Captain Roland Coppola. The latter named officer was not an eye witness to the collision, and only conducted the investigation of the accident.
"Captain Coppola, upon being called to testify, related the positions of the vehicles, the drivers of the respective automobiles and their occupants as he found them at *863 the scene of the accident. He testified that he had included the Brady automobile in his report because Ragland had made a statement to him indicating that Brady had moved his Chevrolet into the lane occupied by Nathan. He said he found no conclusive evidence of damage to Brady's car upon subsequent investigation. He said that Brady seemed to be nervous upon the officer's follow up investigation.
"Gerald B. Nathan, by occupation a sportswear salesman, testified that he had driven that day from his home in Dallas, Texas a distance of some 500 miles. He said that he had been on the road about 9 hours before the accident. He recalled that he was going between 55 to 60 miles per hour just before the accident. While plaintiff's counsel gave considerable import to Nathan's speed being greatly in excess of this in order to cover the distance from Dallas in the elapsed time, the Court is satisfied that Nathan's speed was approximately 60 miles per hour at the time of the accident, and that his speed in itself was not a proximate cause in initiating the collision.
"Nathan said that he had passed a Volkswagon (Ragland's) sometime back and `was gradually passing a Chevrolet (Brady's) when the accident occurred.' He said, `I could see Brady and he started to change lanes.' He further recalled that, `his car appeared to be turning into my lane.' Nathan acknowledged that he was not sure whether there was any contact between his car and Brady's Chevrolet.
"Anthony J. Brady testified that he was driving toward New Orleans in the right or outside lane at approximately 55 miles per hour. He stoutly maintained that he never varied from the right lane at any time since he entered the highway a short distance before. He recalled that the accident occurred to his left and behind him and therefore he did not see it; however, he heard something and looked back and saw a puff of smoke in the northbound traffic lane. He said that he never saw Nathan's car alongside of him at any time.
"Mrs. Brady concurred in her husband's testimony that their car remained consistently in the right lane before and after the accident. She stated that she saw the accident over her left shoulder. She said that immediately when Nathan's car pulled up near the rear of their Chevrolet, `it seemed almost simultaneously going across the neutral ground.' After the accident she said they pulled off on the shoulder and upon retracing steps to the scene, she said someone said something about getting the Brady's license number. While the attorney for Nathan's insurer attached some significance to Brady's actions following the accident and the next day, the Court is of the opinion that the evidence did not warrant proof of a guilty conscience on their part, but rather indicated a concern that they were being implicated without good cause.
"James Ragland, who was in the best position to observe any action between the Brady and Nathan vehicles, testified that `a lot of this was very hazy because it has been a long time ago.' He said however that there were some cars headed toward New Orleans 60 to 80 yards away `* * * one on the inside and one on the outside lane.' He further testified that he saw dirt fly from the car on the inside lane (Nathan's Cadillac) "* * * there was an impact, smoke and a car fly * * *.' After this description of Nathan's car colliding with the cars in the northbound lane, he related about his collision with Perrilloux's car which had crossed the highway ahead into his lane. Ragland said that while he could not remember the accident very clearly he believed that the statement he had given the investigating officer at the time was a true picture of how the accident transpired.
"There can be no argument as to the position held by the plaintiffs who were occupants of the Brandon and Gray vehicles. *864 They were innocent parties to this tragedy and the respective drivers absolutely had no chance to avoid the collision. None of the pleadings filed imply any negligence on the part of these parties. Therefore liability for the accident must be visited upon either Gerald B. Nathan or Anthony J. Brady.
"An excellent treatise on the `sudden emergency doctrine' is given by counsel in this case. A study of the cases cited seem to bear out the contention that the Louisiana Appellate Courts are not loathe to apply this doctrine. This is especially true in cases such as Adams [Odom] v. Foy, 193 So.2d 893 and Canzoueri [Canzoneri] v. Connecticut Fire Insurance Co., 163 So.2d 834, where the respective Courts held that the encroachment or invasion of a lane by another motorist, causing the driver of a vehicle occupying that lane to swerve, was a valid basis for applying this doctrine. However, as noted by the Court in the Adams [Odom] case, supra,
"Faced with this preponderance of the evidence, that the Foy automobile did encroach into Jefferson Highway prior to the accident * * *. (emphasis supplied by writer)'
"Obviously to apply this doctrine this Court must find that there is a preponderance of the evidence in the case showing that Brady made a sudden maneuver encroaching upon the lane occupied by Nathan's automobile.
"Even with a critical analysis and evaluation of the testimony of the limited witnesses to the accident, considerable doubt as to how the accident happened prevades the mind of the writer. To affix fault and liability of such magnitude based upon testimony of an indecisive nature is difficult. This is especially true in the case of Anthony J. Brady. As an illustration, the Court finds it incongruous that a State Police Officer who investigates hundreds of accidents can remember with some clarity what a witness (Ragland) told him, whereas the witness himself (of apparent keen intelligence) fails to recall the significant details regarding the accident. To separate the wheat from the chaff in this testimony often requires the wisdom of Solomon and the intuition of a female. However, the Court is of the opinion that real self doubt as to what occurred between the Nathan and Brady automobiles, if anything, has entered the mind of Mr. Ragland, and accordingly, he is not convinced himself now that there was a movement on the part of Brady's car such as he had previously described to the officer. This is not to indicate that the witness was not honest. To the contrary, the Court believes that he was not sure and as such did not wish to give irrevocable testimony in this regard.
"Admittedly there is testimony alluded to by counsel for the defendants which lends itself to a kind of innuendo; but very little and a concrete way. Or to describe it by a well known legal expressionnot by a preponderance of the evidence. The sum and total presentation and review of this case signals one important factthat Gerald B. Nathan was in the wrong lane for `no proven reason.' For this the jurisprudence yields but one legal conclusion. As stated by the Court in Laughlin v. Allstate Insurance Company, et al., 169 So.2d 396,
"The Trial Judge was well apprised of our law that the driver of an automobile involved in a collision in the wrong lane of traffic is presumed to have been negligent and bears the burden of establishing that he was without fault or that there were circumstances that justified his conduct. Rizley v. Cutrer, 232 La. 655, 95 So.2d 139; Le Bourgeois v. Indiana Lumbermens Mutual Insurance Company, La.App. 1 Cir., 101 So. 2d 720; Carhee v. Scott, La.App. 2 Cir., 104 So.2d 236; Breaux v. Valin, La. App. 3 Cir., 138 So.2d 405.'
"In our opinion Nathan has not borne this burden and shall be held responsible and *865 liable for all the ensuing events and resulting damages that followed his crossing into the northbound traffic lane. This would also include the damages incurred to Perrilloux's automobile in his collision with Ragland, these damages having already been stipulated to in the amount of $350.00. Perrilloux was a short distance behind the Brandon and Gray cars in the northbound lane, and when immediately confronted with the pile up in front of him, swerved into the southbound lane thereby striking Ragland's Volkswagon. In our opinion this situation meets the test of the true sudden emergency doctrine where the driver takes quick action to avoid immediate and sudden peril.
"While the Court has determined that liability has been established against Gerald B. Nathan and consequently his insurer, United States Fire Insurance Company, and the other named defendants being Gerald B. Nathan, Nardis of Dallas, Nardis Sportswear, Bernard L. Gold, Allen J. Gold, Richard S. Gold, Julian Hillard, Julian Hillard Leasing Company, Inc. and United States Fire Insurance Company, counsel for Indiana Lumbermen's Mutual Insurance Company has raised an issue as to Indiana's liability even if Nathan is adjudicated at fault in the accident. As pointed out by counsel, plaintiffs based their case against Indiana on the allegation that Nathan was an employee of Nardis of Dallas, and that prior to and at the time of the accident Nathan was acting in the course and scope of his employment for Nardis; that accordingly Nardis should be held vicariously responsible for the alleged negligence of Nathan, and that Indiana insures Nardis against that possible liability.
"Counsel argues ingeniously that there is no testimony in the record showing that Nathan was in the course and scope of his employment at the time of the accident. He notes that the Court sustained his objection to testimony of Nathan under cross-examination by plaintiffs being used against Indiana under the authority of the Soprano case.
"Soprano v. State Farm Mutual Insurance Co., 1964 [246 La. 524], 165 So.2d 308.
"It is true that there is no testimony or evidence in the record on this point and accordingly the respective suits will be dismissed as to Indiana Lumbermen's Mutual Insurance Company."
With regard to the determination of liability in this case, there is really one fact which is disputed and that is whether or not Anthony J. Brady moved toward or crossed over the line separating the lanes in which his car was traveling and that of the Nathan automobile.
There is no question but that negligence is never presumed, it must be established with reasonable certainty by a preponderance of the evidence. Taylor v. Firemen's Insurance Co., La.App., 139 So. 2d 782. The burden of proving negligence on the part of Mr. Brady was upon Mr. Nathan, who alleges that Mr. Brady crossed over into his lane. The various petitioners have only answered the appeal as to quantum and, therefore, the judgments dismissing the cases against Mr. Brady are now final. Even were this Court to now decide that Mr. Brady was negligent and that his negligence was a proximate cause of the accident, we would be powerless to render a judgment in favor of petitioners and against him.
The disputed statement of Mr. Ragland is as follows:
"I make this statement of my own free will to Trooper Raul V. Esquivoel at the Foundation Hospital.
"I was traveling towards New Orleans and was approximately three miles from the Kenner overpass on the Norco side. I was following approximately 75 yards behind two cars who appeared to be parallel with each other. I was on the outside lane. It looked to me that the *866 car on the outside lane moved out of its lane slightly toward the car on the inside lane. After this I saw the accident start developing. As I was fairly far behind I thought I was out of danger but started stopping. When I was just about stopped I noticed a car coming toward me and we collided.
"I got out of the car and noticed that my son Richard 3 yrs. old was injured. I noticed that a car also had stopped which I believed had been the car in the outside lane. I read the License No. and I believe it was 165B849 but I had no paper to write this on or a pencil. The man driving this car was accompanied by a woman. He said he would go for help. A friend of mine Mr. Ivan Keller came up at this instant from New Orleans and took me and my family to this hospital." (Emphasis supplied)
Even were we to determine that the Lower Court incorrectly withheld the admission of this document, and were to allow the statement to be admitted, we would still be of the opinion that the preponderance of the evidence does not show that Brady was negligent. The statement is too indefinite and inconclusive to overcome the testimony adduced at trial.
Analyzing the statement, we find Mr. Ragland saying that he was 75 yards behind two cars who appeared to be parallel to each other. The testimony shows it was raining at the time and Mr. Ragland's windshield wipers were in operation. The statement then says that "It looked to me (Ragland) that the car on the outside lane moved out of its lane slightly toward the car on the inside lane." (emphasis supplied) After this he saw the accident start developing.
Later the statement says: "I noticed that a car also had stopped which I believed had been the car in the outside lane. I read the License No. and I believe it was 165B849 (Mr. Brady's No.) but I had no paper to write this on or a pencil." (Emphasis supplied)
Actually, Mr. Ragland testified by deposition approximately one year following the accident substantially the same as the questioned statement. The testimony of the witness at the deposition was as follows:
"Q: What was the first notice you had that an accident was going to happen or likely to happen?
"A: Well, of course, I prefer that the statement that I made right after the accident be held as I think after this long a time, you realize I'm sure even you, that something that happened this long ago and you would be more correct. But the indication, to specifically answer your question, it appeared that possibly the one car * * * they moved closer together and right after this one car flew across the neutral ground and I saw the accident develop.
"Q: By the word `possibly' I assume that you're not sure that this occurred. What we're trying to find out, Mr. Ragland, is what you're sure of today as to what happened.
"A: Well * * * (interrupted)
"Q: What do you remember today that you saw at that time?
"A: I saw the two (2) cars in front of me and it appeared that one car tended to move in slightly towards the other car.
"Q: Now which car tended to move?
"A: The car on the outside lane.
"Q: And you remember seeing that?
"A: I believe I do.
"Q: Well now are you positive that that's what you saw?
"A: Yes.

*867 "Q: Did the car which tended to move in go across the center line between the inside and outside lanes?
"A: This I cannot answer."
The sum and substance of the testimony of Mr. Ragland, although inconclusive and very indecisive, was substantially the same as what was contained in the written statement and, therefore, the Lower Court correctly refused to admit the written statement into the evidence. Builliard v. New Orleans Terminal Co., 185 La. 924, 171 So. 78.
With regard to the question of negligence on the part of Mr. Brady, the Lower Court was confronted with the witnesses and was in an excellent position to weigh the evidence and reach its decision as to this question. It is apparent that at the time of the trial, Mr. Ragland was not sure as to any movements on the part of the Brady vehicle prior to or at the time of the accident, however, he did recall that immediately after the accident it was his opinion or he believed that some motion had been made by the Brady car toward the lane occupied by Mr. Nathan. This was while he was a distance of some seventy-five yards to the rear of these two vehicles at which time it was raining and the windshield wipers were working. The testimony was clear and definite to the effect that there was no collision between the Nathan vehicle and the Brady vehicle and even were we to assume that some motion were to have taken place as believed by Mr. Ragland, it is not shown that there was a sudden emergency created which would cast Mr. Brady in negligence. We feel that the Lower Court was correct in holding that the sole and proximate cause of the accident was the negligence of Mr. Nathan, who we will recall had driven some five hundred miles during a period of nine hours prior to the accident.
The Lower Court awarded Bessie Hendricks Brandon, widow of Dave Brandon, Jr., the sum of $40,000.00, for damages covering the death of her late husband. At the time of his death, Mr. Brandon was 46 years of age with a life expectancy of 29 years. Although the Brandons were childless, they had been married for approximately 13 years and were apparently a very devoted couple. By way of stipulation it was agreed that his future earnings could have reached $50,000.00, as a gross figure. In addition, special damages stipulated at $925.00, for funeral expenses, were awarded to Mrs. Brandon by the Lower Court.
Mrs. Pauline Bowman was also awarded the sum of $40,000.00, for the death of her husband, Alton Bowman, who was 42 years of age at the time of his death and whose gross earnings were projected by stipulation at $63,000.00. Counsel for defendant contends, however, that since no evidence was offered showing a termination of a prior marriage between Bowman and Carrie Jefferson, the claim of Pauline Bowman as surviving spouse should fail. The Lower Court, however, correctly held that under the law it is presumed that the marriage to Pauline Bowman was a valid one as indicated from the jurisprudence set forth in Patterson v. Gaines, 47 U.S. 550, 6 How. 550, 12 L. Ed. 553, in which the Court said:
"Where the validity of a woman's second marriage is contested on the ground that she had a former husband living, from whom she was not divorced, the burden of proof is on the party alleging the invalidity."
We concur with the decision of the Lower Court to the effect that the defendant has failed to sustain its burden of proof, and we find no error in awarding Mrs. Bowman the sum of $40,000.00 for the death of her late husband.
With regard to the claim of Jeanette Bowman, the alleged surviving child of Alton Bowman, there is a question as to her legitimacy. The birth certificate of Jeanette filed into the record establishes *868 her birth as July 3, 1956, with the father named as Alton Bowman and the mother named as Carrie Jefferson. The marriage certificate filed of record shows that Alton Bowman and Pauline Bowman were married on May 25, 1963, some nine years after the birth of Jeanette. There is no valid proof of record to show any marriage between Carrie Jefferson and Alton Bowman and, therefore, there is no valid proof of record to show that Jeanette Bowman is the legitimate daughter of Alton Bowman under the laws of this State.
The Court, however, held that the status of Jeanette Bowman must be determined under the laws of the State of California in which state she was born and domiciled and, as such, she is legitimate and entitled to recover under Art. 2315 of the Louisiana Civil Code. This decision by the Lower Court was predicated on Probate Code Section 255 of the State of California. The evidence indicates that Alton Bowman supported Jeanette Bowman as his child and that the child cared for and loved her father. The Lower Court, therefore, awarded her the sum of $7,500.00, for the loss of her father's support and affection, and we feel such an award is reasonable.
The claim of Beulah Brandon Patterson, the surviving daughter of Dave Brandon, Sr., is one limited to loss of love and affection, as she was married and not dependent on her father for support. Although her father was in advanced years at the time of his death, the evidence indicates there was a close relationship between himself and his daughter, and the Lower Court reasonably awarded her the sum of $5,000.00 for the loss of her father.
For the same reasons as set forth in the award to Beulah Patterson, the Lower Court awarded Lucy Brandon Sterling the sum of $5,000.00, for the loss of her father. In addition thereto, the Lower Court awarded both the sisters the sum of $940.07, which, by stipulation of counsel, represented the burial expenses paid by them. We feel that both of these awards are justified.
We now come to the amount of damages awarded by the Lower Court in favor of the parties who were injured, not fatally, in this accident. Leonard Augillard sustained a broken right leg as a result of the accident which confined him to bed for a period of approximately one week. His leg remained in a cast for eleven weeks. He also suffered general contusions of his chest and other extremities. There were no permanent disabilities and the Lower Court awarded him the sum of $4,000.00, plus the sum of $903.40, as special damages.
Charley Gray sustained a fracture of his right arm necessitating surgery. He was in a cast for seven weeks. Additionally he received a cut to his chin requiring seven stitches. He has no disabilities although he does complain of trouble to his right elbow. The Lower Court awarded him $5,000.00, plus special damages which were stipulated at $880.50.
Lugine Gray, the driver of the Gray automobile, received a puncture wound on his right knee. He also sustained a blow to his head resulting in frequent headaches. He did not require immediate treatment by a doctor, however, he did lose several days of work as a result of the accident. The Lower Court correctly awarded him $750.00, plus stipulated damages in the sum of $211.40.
Lee Royal Gray was brought to Charity Hospital following the accident. However, the record shows no injuries until he went to a doctor in late July, some two months after the accident. Considering the tremendous impact of the collision, the Lower Court concluded that he must have suffered some abrasions and bruises. The Court, therefore, awarded him $500.00, plus stipulated damages of $374.00.
Similarly, Eddie Washington was not examined by a physician for his injuries until some two months following the accident. Although he complained that he had hurt his ankle and chest, his injuries *869 were obviously of a moderate nature. The Lower Court awarded him $500.00, plus special damages stipulated at $123.50.
Izell Shelvin received a laceration of the left leg, a cut on his lower lip and loosening of three teeth which subsequently required their removal and replacement by a bridge. He was awarded the sum of $5,000.00, plus special damages stipulated at $600.60.
The claim of Edward Perrilloux was stipulated at the sum of $350.00, and an award for same was made by the Lower Court.
The Lower Court awarded Motors Insurance Corporation the stipulated sum of $1,430.00, for its subrogation claim representing losses incurred from damages to the Brandon and Gray vehicles. In Ballard v. National Indemnity Co. of Omaha, 246 La. 963, 169 So.2d 64, the Court said:
"On appeal, if the appellate court affirms the lower court and quantum is the issue, the court should then review all the facts and circumstances on which the lower court bases the quantum of award, but this review is confined to determining where there has been an abuse of the `much discretion' vested in the trial court in assessing damages."
The Court then went on to say further:
"However, an appellate court should not fix the amount of the award solely to maintain uniformity of awards, thus ignoring the prerogatives of the trial judge or jury in assessing awards in such cases as set forth in Art. 1934 of the Civil Code. The amounts of awards in so-called `similar' cases are relevant only to determine whether there has been an abuse of discretion, but for no other purposethat is, to determine whether the award is so excessive or so inadequate as to be an abuse of discretion. In this connection it must always be remembered, as said in Gaspard, that `* * * cases relied upon may be similar in that each of them involves a similar injury such as a broken arm, the loss of an eye or eyes, or the loss of some member of the body. Thereafter, however, the similarity ceases for each case is different, and the adequacy or inadequacy of the award should be determined by the facts and circumstances peculiar to the case under consideration.'"
We believe that under the doctrine set forth in the Ballard case as well as that of Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149, the decision of the judge or the jury below as to quantum should be affirmed by the appellate court unless there is a clear abuse of the considerable discretion of the judge or jury below. We find no such abuse in the present case, on the contrary, we feel that the awards granted by the Lower Court were reasonable and proper.
For the reasons hereinabove assigned, the judgment of the Lower Court will be affirmed, all costs of this appeal to be paid by the defendant.
Judgment affirmed.