265 So.2d 845 (1972)
Joseph Enos THERIOT, Plaintiff and Appellee,
v.
TRANSIT CASUALTY COMPANY and Jim S. Hebert, Defendants and Appellants.
No. 3941.
Court of Appeal of Louisiana, Third Circuit.
August 4, 1972.
Rehearing Denied September 13, 1972.
Writ Refused October 19, 1972.
*846 Hall, Raggio & Farrar, by Thomas L. Raggio, Lake Charles, for defendant-appellants.
Cormie & Morgan, by Robert E. Morgan, Lake Charles, for plaintiff-appellee.
Before FRUGÉ, SAVOY and DOMENGEAUX, JJ.
DOMENGEAUX, Judge.
At approximately 11:00 P.M. on September 27, 1970, plaintiff was driving his Ford Econoline van type truck in a northerly direction on Louisiana Highway 27 near Creole, Louisiana, on his way to work on the Gibbstown Bridge where he was employed as a bridge tender. About one and one-half miles south of the bridge he crossed defendants' truck going south. The latter was a tractor trailer type vehicle with the trailer portion measuring four feet in width and thirty-two feet in length. It was carrying a 14,900 lb. load consisting of oil field pipes and tools.
As the two vehicles crossed each other in their respective lanes of travel, the two wheels on the left side of the single axle on defendants' trailer suddenly became detached. At least one of the wheels struck the plaintiff's van, knocking it into the marsh on the side of the road, and producing the injuries herein complained of.
Plaintiff filed suit against Transit Casualty Company, liability insuror of the offending truck, and Jim S. Hebert, its driver at the time of the accident. The case was tried by a jury and resulted in a judgment in favor of plaintiff and against both defendants in the amount of $30,000.00. Defendants appealed that judgment to this court.
The evidence does not show why the wheels became detached, but following the accident an inspection of the hub revealed that all six of the lugs formerly holding the wheel had been sheared off. Presumably the detachment of the wheels followed the shearing of the lugs holding them, and *847 although there is no evidence of why the lugs broke, there is some testimony that this sometimes results from the lug nuts being either too tight or too loose.
Defendant Hebert admitted that he was not in the habit of checking the lugs on his wheels before each trip and that he did not do so before the one in question. He stated that he had had a loose lug nut on the left side of his trailer, due to stripping of the threads on the lug, but that he thought that to have been repaired prior to the accident. The repairs were said to have been made by Prudhomme Tire Service of Lafayette, Louisiana, two days before the accident, when it installed two new tires on the trailer.
An employee of that firm, Wilbert J. Ducharmie, produced the records of his company for the month of September, 1970. They showed that a tire was repaired on the defendant's trailer on September 21, 1970. However, there was no record of any tire changes or lug repairs at any time in that month, as testified to by Hebert. On cross-examination a statement from Prudhomme Tire Center, Inc., which showed that the firm had installed new tires on another of the trailers belonging to Hebert's employer, was introduced to impeach Mr. Ducharmie's statement that no tires had been installed on any of the vehicles belonging to defendant's employer during the month of September.
Be that as it may, once it was established that the offending trailer was within defendants' entire and exclusive control, that its wheels became detached and struck plaintiff's vehicle, and that such would not ordinarily happen had defendants used proper care, the doctrine of res ipsa loquitur became applicable. Guerra v. W. J. Young Construction Company, La. App., 165 So.2d 882; writ refused 246 La. 864, 167 So.2d 676; Ross v. Tynes, La. App., 14 So.2d 80; writ refused Nov. 7, 1943. An inference of negligence was then created and it therefore became incumbent on the defendants to advance such proof as would overcome that inference.
They sought to do this by invoking the latent defect doctrine, i. e., they argue that the detachment of the wheels was caused by a latent defect in the lugs which could not have been discovered by reasonable inspection. Unfortunately neither the broken lugs nor any part thereof were presented for the court's consideration. Neither was there any expert testimony in the field of metallurgy to indicate why the lugs may have sheared. Under these circumstances we cannot exculpate the defendants on the basis of a latent defect. Guerra v. W. J. Young Construction Company, supra.
The admissions on the part of defendant Hebert regarding his failure to inspect the lug nuts on his trailer, together with the rather nebulous testimony regarding the repairs said to have been made by Prudhomme Service Center, Inc., further weakens defendants' position. That position is not significantly strengthened by testimony that approximately one month before the accident the trailer passed a state motor vehicle inspection. The mechanic actually making the inspection did not testify, hence we can only assume that the inspection was properly performed. Additionally, much could have transpired during the intervening time to make unsafe what was safe one month earlier.
The defendants, then, have not overcome the inference of negligence on their part, and accordingly we cannot say that the jury erred in their finding of liability. That finding is therefore affirmed.
Turning now to the issue of quantum, we find that plaintiff was, at the time of the accident, some forty-three years of age, and was employed as a bridge tender by the Department of Highways of the state of Louisiana, at a wage of $560.00 per month. In addition, he earned some $70.00 per month selling household products in a door-to-door fashion.
*848 Plaintiff's treating physician, Dr. George W. Dix, examined him at the South Cameron Memorial Hospital some two hours after the accident on September 28, 1970. He found plaintiff to have suffered abrasions and contusions of the left ankle, both knees, the upper abdomen, the right anterior chest, and the head. In addition he had lacerations of the right hand and thumb. He hospitalized plaintiff until October 2, 1970, during which time he was treated with anti-flammatory agents, analgesics, antibiotics, and sedatives.
A pre-existing heart condition, paroxysmal auricular tachycardia, described by Dr. Dix as being an accelerated heart beat, was aggravated by the accident. Plaintiff's heart rate increased somewhat immediately after the accident, but not so much as Dr. Dix feared that it would. This, said the doctor, was probably due to the heavy sedation given plaintiff. Later, however, he had much more frequent bouts of tachycardia than he had had before the accident. In fact, he had had no attacks for nearly one year prior to the accident, whereas he had several during the ensuing months.
After some four or five months the heart condition had almost returned to its pre-accident status. However, it was Dr. Dix's opinion that the effects of the accident on plaintiff's heart were such that his total years of active life would be somewhat decreased.
Defendants point out plaintiff's failure to call a medical specialist, Dr. Hugh DeLaureal, who had examined him in connection with his heart ailment on several occasions both before and after the accident. This they say creates a presumption that Dr. DeLaureal's testimony would be detrimental to plaintiff's case. We agree that such a presumption may arise under the circumstances, however, we opine that whatever detrimental effect that presumption may have on plaintiff's case is overcome by the direct testimony of Dr. Dix. In any event, the primary injury received by plaintiff appears to have been not to his heart but to his left ankle.
It was in the left ankle that Dr. Dix considered him to have a permanent disability which he estimated at fifteen percent. The initial injury to the ankle was described by Dr. Dix as being a severe contusion with strain and tearing of small tissues as well as strain of the larger ligaments. The doctor opined that the permanent residuals of that injury would always give plaintiff some degree of discomfort or pain while walking (especially on uneven surfaces), standing for long periods of time, or otherwise using his left ankle. In addition, the chances of re-injuring the ankle were greatly increased by the effects of the accident.
We are favored with the opinions of two orthopaedic specialists on the question of the ankle injury, they being Dr. C. V. Hatchette and Dr. Norman P. Morin. The former examined plaintiff twice, on November 24, 1970, and on February 8, 1971. The latter examined plaintiff but once, on March 15, 1971.
Dr. Hatchette opined that plaintiff had suffered a severe sprain of the left ankle involving the ligamentous structures of that area. By the time of the second visit he could find only mild sensitivity to pressure over the deltoid ligament area of the left ankle to indicate any continued disability. Plaintiff, however, was still complaining of pain in the area and expressed concern about walking on uneven terrain. It is apparent from his reports that Dr. Hatchette concerned himself only with plaintiff's occupation as a bridge tender, and did not consider his selling activities, in stating that he could return to work.
Dr. Morin's examination of plaintiff disclosed some mild to moderate residual thickening about the medial malleolus, due to the scarring of ligaments. This limited the inversion movement of the foot (said by the doctor to be important to walking on uneven surfaces) and resulted in a five to ten percent partial permanent disability.
*849 Dr. Morin stated that plaintiff could have discomfort and occasional pain if he should walk extensively or on uneven surfaces, but nevertheless he opined that plaintiff could return to both of his occupations as of March 15, 1971.
It is evident from the foregoing discussion of the medical evidence that the jury relied more heavily on the testimony of Dr. Dix than on that of Doctors Hatchette and Morin. We cannot say that it erred in this assessment of weight to the evidence, for as we said in Gates v. Ashy Construction Company, La.App., 171 So.2d 742, writ refused, 247 La. 678, 173 So.2d 542:
. . . But we find no error in the trial court's having accepted instead the testimony of the attending general practitioner, because of the latter's much greater opportunities for observation over his extended period of treatment of the plaintiff, as compared with those of the specialist who saw the plaintiff briefly and chiefly for the purpose of forensic examination . . .
See also Touchet v. Fidelity & Casualty Company of New York, La.App., 264 So.2d 752; Clark v. Maryland Casualty Company, La.App., 223 So.2d 171; Moulard v. Massman Construction Company, La.App., 209 So.2d 742; Treadway v. State Farm Insurance Company, La.App., 204 So.2d 609; Johnson v. R. P. Farnsworth and Company, La.App., 186 So.2d 405; and Murphy v. American General Insurance Company, La.App., 122 So.2d 100.
In addition to the physical injuries hereinabove described, plaintiff's damages included the loss of his van truck, for which he had paid $800.00; and the loss of $125.00 worth of his wares contained in the truck at the time of the accident, as well as some shelves specially constructed in the truck and valued at $70.19. Towing charges for pulling the truck from the marsh amounted to $40.00. His medical expenses as of the date of trial totaled some $1,281.82. He missed six months of his regular employment as a bridge tender, during which time he used up a large percentage of his accumulated sick leave. Every indication is that plaintiff will never return to his secondary occupation as a salesman.
Trial juries are afforded great discretion in fixing the damages to be awarded to successful plaintiffs, and their awards may not be disturbed on appeal in the absence of a manifest abuse of that discretion. La.C.C. Art. 1934(3); Miller v. Thomas, 258 La. 285, 246 So.2d 16; Lomenick v. Schoeffler, 250 La. 959, 200 So. 2d 127; Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149. The award made in this case, $30,000.00, while it may border on the upper limits of the jury's discretion, is not, in view of all the evidence, and the cases cited, so excessive as to warrant our interference.
For the above and foregoing reasons the judgment of the district court is affirmed at defendants'appellants' costs in both courts.
Affirmed.