285 So.2d 267 (1973)
Frances H. LITTLE et al., Plaintiffs-Appellees,
v.
MISSISSIPPI CHEMICAL EXPRESS, INC., and United States Fidelity & Guaranty Co., Defendants-Appellants.
No. 4321.
Court of Appeal of Louisiana, Third Circuit.
November 5, 1973.
Dissenting Opinion November 9, 1973.
Rehearing Denied December 3, 1973.
Writ Refused January 25, 1974.
*269 Hall, Raggio & Farrar by Fred L. Cappel, Lake Charles, for defendants-appellants.
Larry A. Roach, Lake Charles, for plaintiffs-appellees.
Before CULPEPPER, MILLER and PONDER, JJ.
PONDER, Judge.
Frances H. Little, Martha Lelia Burkett and Odis O. Halstead filed this suit against Mississippi Chemical Express, Inc. and its insurer, United States Fidelity & Guaranty Company, for personal injuries and property damage sustained when the automobile and pickup truck which they were occupying was struck from the rear by a large tractor-trailer unit owned and insured by the respective defendants. However, defendant, Mississippi Chemical Express, Inc., a Mississippi corporation, was not served with process prior to trial and did not make an appearance. The trial court did, however, render judgment against the insurer, concluding that the sole and proximate cause of the tragic accident was the negligence of defendant's driver.
United States Fidelity & Guaranty Company (U. S. F. & G.) filed a motion for a new trial, alleging among other things that the judgment originally rendered exceeded the policy limits. The motion was granted, and as a result the original judgment was reduced from a total of $104,457.86 to $70,934.68.
U. S. F. & G. has appealed the judgment, and plaintiff answered the appeal praying that the judgment be increased.
There are several issues herein as follows: (1) Was the insured's driver guilty of negligence which was a proximate cause of the accident? (2) Were the injured parties guilty of contributory negligence? (3) Did the original award exceed the policy limits? (4) Were the awards, as finally rendered, either excessive or inadequate?
The accident occurred on December 11, 1970, at approximately 3:20 A.M. Frances H. Little was driving a 1965 Buick stationwagon. With her were her husband, Olan B. Little, three of their children, Phillip H. Little, Joseph W. Little, and Gary T. Little, Frances Little's sister-in-law, Jean Halstead, and her son, Dale W. Halstead. This vehicle was being followed by a 1955 Ford pickup driven by Odis Halstead, the husband of Jean Halstead, who was accompanied by Billy C. Little, son of Olan and Frances, and by one Oscar Gonzales. The pickup was towing a closed top rental trailer.
While the Little and Halstead vehicles, traveling east on Interstate Highway 10, were crossing the Calcasieu River bridge immediately prior to entering Lake Charles, they stopped about .4 of a mile (or 2/3 of the way) up the west incline of the bridge because of a malfunction in the pickup's transmission. Odis Halstead immediately began blinking his headlights (a prearranged signal) to notify the leading vehicle of his problems. Frances Little noticed the lights, stopped her car, and backed down to Mr. Halstead to render assistance. At this point, Olan Little left the stationwagon, and Billy Little and Oscar Gonzales got out of the pickup. They chained the pickup to the car with the intent to pull it over and off the bridge. However, the chain broke, and a second effort had to be made to connect the vehicles. Odis Halstead testified that at that time, when Billy C. Little and Oscar Gonzales left the pickup for the second time, he handed Oscar a flashlight and told him to go back down the bridge to warn the approaching traffic. Nevertheless, while Olan and Billy Little were attempting to couple the two vehicles together, a large tractor-trailer unit collided with the rear *270 of the rental trailer attached to the pickup. As a result, the two Little men were killed, several of the other individuals were injured, and all the vehicles were damaged.
The trial judge found that the driver of the large tractor-trailer unit, Moses Saliba, was guilty of negligence for traveling at an excessive rate of speed under the circumstances so that he was not able to keep his vehicle under control, and that such negligence was the sole proximate cause of the accident.
Plaintiffs contend that defendant's driver violated the standard of conduct for nighttime drivers under adverse conditions.
Defendant, U. S. F. & G., contends that under our present jurisprudence the mere fact that the collision occurred is not sufficient to support a presumption that a rear ending motorist was guilty of negligence when the accident occurs at night and during adverse weather conditions. Craker v. Allstate Insurance Company, 259 La. 578, 250 So.2d 746 (1971). Defendant further maintains that its driver, Saliba, was not traveling at an unreasonable speed under the circumstances, and that Saliba's speed was not the cause of the accident.
It is undisputed that at the time of the accident there was a heavy fog, and visibility was very poor. Saliba testified that immediately prior to the collision he was traveling about 40 m. p. h. and that he did not see anything in the road until he was about 30 to 40 feet from plaintiff's vehicles, at which time he saw simultaneously the trailer and someone with a flashlight. He stated that he turned on his left signal light and attempted to go around the obstructing vehicles, but his trailer "jackknifed" and the collision occurred. He admitted that when approaching this bridge truckdrivers will normally attempt to increase their speed so that they will be able to reach the top without having to downshift. He maintained, however, that he did not do so on this occasion because of the fog.
The physical evidence reveals that the tractor-trailer unit struck the center median of the bridge at a point some 92 feet prior to the point of collision. It then traveled against the railing for approximately 60 feet and then left the rail and skidded the remaining distance into the trailer. One of the investigating officers testified that Saliba had told him that he had been going 45 m. p. h. The trial judge concluded that Saliba had been traveling about 50 m. p. h.
We agree with defendant that the mere fact that the collision occurred in this case does not prove negligence on its driver's part. Our Supreme Court in Craker v. Allstate Insurance Company, supra, recognized the "assured clear distance" rule as "unworkable and unrealistic with modern vehicles on modern highways." In its place the court substituted a "standard of care of the nighttime driver based upon the broad requirement of reasonableness, a formula of negligence where there are few absolute rules and one requiring a careful consideration of all circumstances surrounding each case." The trial judge recognized the rule in Craker, and we find little difficulty in agreeing with his conclusion that defendant's driver was guilty of negligence which was a proximate cause of this tragic accident.[1] When visibility is materially impaired by atmospheric conditions, including fog, a motorist is held to a duty of operating his vehicle with an unusually high degree of care. Broussard v. Saia Motor Freight Line, Inc., 277 So.2d 488 (La.App. 1 Cir. 1973); Dufrene v. Miller, 266 So.2d 462 (La.App. 4 Cir. 1972); Campbell v. American Home Assurance Company, 241 So.2d 81 (La.App. 3 Cir. 1970); Hernandez v. State Farm Mutual Automobile Ins. Co., 192 So.2d 679 (La.App. 3 Cir. 1966), and *271 cases cited therein. Saliba was driving a large tractor-trailer unit that weighed approximately 40,000 pounds, and was traveling between 40 and 50 m. p. h. immediately prior to the accident under poor visibility conditions. We feel that had Saliba adhered to the high degree of care required of him under these circumstances, he would have been able to bring his truck to a stop in time to avoid the accident, or at least to have gone around the stalled vehicle.
Alternatively, defendant maintains that contributory negligence bars the right of the plaintiffs to recover in this case. It is argued that the rear of the trailer was not lighted, that there was a violation of R.S. 32:141(B) and (C) and 32:367(A)(1) relative to placing flares on the roadway, and that in fact, no attempt whatsoever was made to warn approaching traffic of the stalled vehicle. Defendant further urges that contributory negligence on the part of anyone of the parties in the plaintiffs' vehicles is imputable to the rest of them.
Appellee contends that the trailer was sufficiently lighted, and that in addition thereto, warning was given by Oscar Gonzales who was sent down the bridge with a flashlight.
Defendant offered no evidentiary support for its contention that the taillights on the trailer were not functioning at the time of the accident other than Saliba's failure to see them. Plaintiffs, however, offered the testimony of two disinterested service station attendants who had inspected the lights and made sure they were operating correctly less than one and one-half hours prior to the accident. We conclude that the lights were burning.
Regarding the contention by plaintiff that Oscar Gonzales had stationed himself behind the scene to warn approaching vehicles, we agree with defendant that Gonzales' testimony is so replete with inconsistencies that it can be given little if any credence. This, however, is not determinative of the outcome of this case.
We turn now to defendant's contention of contributory negligence based on the violation of certain highway regulatory statutes. Section B and C of R.S. 32:141 read as follows:
"B. The provisions of this Section shall not apply to the driver of any vehicle which is disabled while on the main traveled portion of a highway so that it is impossible to avoid stopping and temporarily leaving the vehicle in that position. However, the driver shall remove the vehicle as soon as possible, and until it is removed it is his responsibility to protect traffic.
"C. The driver of any vehicle left parked, attended or unattended, on any highway, between sunset and sunrise, shall display appropriate signal lights thereon, sufficient to warn approaching traffic of its presence. Acts 1962, No. 310, § 1."
Paragraph B placed upon plaintiff, Odis Halstead, the driver of the stalled vehicle in this case, the responsibility to protect traffic. Presumably this responsibility would have been fulfilled had he displayed the lights required by paragraph C. Agnello v. Allstate Insurance Co., 252 So.2d 538 (La.App. 4 Cir. 1971). There has been no showing that the lights on the trailer and pickup truck were not the "appropriate signal lights." See R.S. 32:314. Consequently, we are unable to find that Section 141 has been violated.
On the other hand, R.S. 32:367(A)(1) presents a more serious problem. It states:
"A. No person shall operate any freight carrying vehicle, passenger bus, truck tractor, or any motor vehicle towing a house trailer or other vehicle, upon any highway of this state at any time between sunset and sunrise, unless there is carried in such vehicle the following equipment, except as provided in Subsection B:
"(1) At least three flares, three red electric lanterns, or three portable red *272 emergency reflectors, each of which shall be capable of being seen and distinguished at a distance of not less than 600 feet under normal atmospheric conditions at night time."
In addition, the requirements of placing these flares are prescribed in R.S. 32:368(C)(1)(2) and (3) as follows:
"C. Whenever any vehicle of a type referred to in this Section is disabled upon any roadway of a divided highway of the state during the time that lights are required, the appropriate warning devices prescribed in Sub-sections A and E of this Section shall be placed as follows:
"(1) One at a distance of approximately 200 feet from the vehicle in the center of the lane occupied by the stopped vehicle and in the direction of traffic approaching in that lane;
"(2) One at a distance of approximately 100 feet from the vehicle in the center of the lane occupied by the vehicle and in the direction of traffic approaching in that lane;
"(3) One at the traffic side of the vehicle and approximately 10 feet from the vehicle in the direction of the nearest approaching traffic."
The record of this case is clear that there was no compliance with the above regulations for carrying and displaying emergency warning devices.
The highway regulatory provisions of Title 32, and more particularly Sections 367 and 368, were designed as safety measures for the protection of life and property. The particular provisions involved herein were enacted to provide a warning to drivers, even speeding or inattentive ones, that their passage may be impeded by another vehicle in the roadway ahead. They are designed to inform users of the highway of risks which are causative of motor vehicle accidents. However, a violation will not be a bar to recovery unless it was a legal or proximate cause of this accident. Theunissen v. Guidry, 244 La. 631, 153 So.2d 869 (1963).
There is little question that the negligent conduct herein was a cause in fact of the resulting harm. It is an inescapable conclusion that the failure to display the required warning devices was a substantial factor in bringing about the harm, thus constituting a cause in fact. Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962).
A reading of R.S. 32:367 and 368 reveals that they are directed to the operator or driver of a freight carrying vehicle. Consequently, it is clear that Odis Halstead, the driver of the pickup truck which was pulling the rental trailer, was contributorily negligent. In addition, however, defendant maintains that the parties in the plaintiffs' vehicles were on a joint venture, and therefore the negligence of any adult party should be imputed to all the adults. We disagree. An essential factor for applicability of the joint venture rule is equal right to control the operation of the vehicle. Lawrason v. Richard, 172 La. 696, 135 So. 29 (1931); Bagley v. Commercial Union Ins. Co. of New York, 216 So.2d 102 (La.App. 1 Cir. 1968); Sumrall v. Aetna Casualty and Surety Company, 124 So.2d 168 (La.App. 2 Cir. 1960). In the present case Odis Halstead was the owner and had sole control over the pickup truck. Consequently, his negligence in failing to comply with regulations relative to warning devices cannot be imputed to anyone else.
As an alternative to its allegation of contributory negligence on the part of the deceased individuals, defendant insurer contends that they must be held to have assumed the risk. Assumption of the risk is a rather narrow defense which is restricted by requirements that the plaintiff know and understand the particular risk he is incurring, and that his choice to so assume said risk is entirely free and voluntary. Prosser, Law of Torts, § 67 (1964). Pretermitting a discussion of whether the deceased *273 individuals herein were aware of the exact risk incurred, we do not feel that they voluntarily assumed that risk. When the pickup truck stalled without adequate warning devices, a perilous situation threatening both lives and property was created. We cannot say that when the deceased men chose to remove the dangerous condition from the highway, they thereby relieved the defendant from its liability. Johnson v. Price, 183 So.2d 364 (La.App. 4 Cir. 1966). Consequently, the defense of assumption of the risk will not be sustained.
Plaintiff avers that the trial judge erroneously applied the limits of liability stated in the policy. The contractual limits were set at $50,000.00 for each person and $100,000.00 for each occurrence. Plaintiff argues that since more than one individual suffered injury, the "each person" limit ceased to be applicable.
Defendant maintains that the policy is clear in its intent that the "each person" and "each occurrence" limits operate concurrently and that the $50,000.00 limit remains in effect even when greater than one person is injured.
The pertinent provisions read as follows:
"III. LIMITS OF LIABILITY
"Regardless of the number of (1) insureds under this policy, (2) persons or organizations who sustain bodily injury or property damage, (3) claims made or suits brought on account of bodily injury or property damage or (4) automobiles to which this policy applies, the Company's liability is limited as follows:
"Coverage CThe limit of bodily injury liability stated in the declarations as applicable to `each person' is the limit of the Company's liability for all damages because of bodily injury sustained by one person as the result of any one occurrence; but subject to the above provision respecting `each person', the total liability of the Company for all damages because of bodily injury sustained by two or more persons as the result of any one occurrence shall not exceed the limit of bodily injury liability stated in the declarations as applicable to `each occurrence.'" (Emphasis added.)
The policy states that the "each occurrence" limitation shall apply subject to the "each person" limitation. Accordingly, there can be no doubt that the trial judge correctly applied the $50,000.00 limit in this case. For a similar application of like policy provisions see Standard Acc. Ins. Co. of Detroit, Mich. v. Winget, 197 F.2d 97 (CA9 Cir. 1952).
In regard to the issue of quantum, we are guided in our decision by the well settled law that the assessment of damages for personal injuries is a matter in which the trial judge is given broad discretion. LSA-C.C. art. 1934(3). In the absence of a manifest abuse of that discretion, an appellate court shall not disturb his awards. Miller v. Thomas, 258 La. 285, 246 So.2d 16 (1971); Theriot v. Transit Casualty Company, 265 So.2d 845 (La.App. 3 Cir. 1972); Duplechin v. Pittsburgh Plate Glass Company, 265 So.2d 787 (La.App. 3 Cir. 1972).
In view of our discussion above, the only issue regarding the award for the death of Olan B. Little is whether it was excessive or not. He was 43 years old at the time of his death and left a widow and four children, ages 19, 15, 12 and 11. While admittedly the proof as to earning capacity and support habits is not the most cleancut and decedent was not of the most sterling character, we cannot hold that the award of the trial court was excessive. Gray v. Nathan, 221 So.2d 859 (La.App. 1 Cir. 1969).
Nor can we find that the award for the death of Billy C. Little was either excessive or inadequate. Bellard v. Liberty Mutual Insurance Co., 208 So.2d 706 (La.App. 3 Cir. 1968).
For the same reasons we affirm the awards for the injuries of Phillip Herman *274 Little, Joseph Wayne Little and Gary Timothy Little.
In sum, we conclude that the trial judge was correct in his finding that defendant's driver was guilty of negligence which was a proximate cause of the accident. Except in the case of Odis Halstead, we also agree with his conclusion that there was no contributory negligence in this case. Furthermore, we find that the defense of assumption of the risk is without merit.
For the reasons assigned above, the judgment in favor of Odis Halstead is reversed. The judgment in favor of the remaining plaintiffs is affirmed as rendered. Defendant is to pay all costs.
Affirmed in part, reversed in part.
MILLER, J., dissents and assigns written reasons.
MILLER, Judge (dissenting in part).
I respectfully dissent from the determination that decedents Olan and Billy Little were free from contributory negligence. The trial court and now this court has 1) failed to hold decedents to the standard of using ordinary care for their own safety, and 2) based the decision on manifestly erroneous factual determinations unsupported in the record.
It has been held that defendant's overtaking truck ran into a trailer (no notice having been taken that the rearended Nationwide trailer van had been painted black so as to obscure the Nationwide signs) while decedents were attempting to attach a chain from the front of the pickup truck (which was towing the black trailer) to the back of the lead vehicle.
This version of the accident was given only once and then at trial by one Odis Halstead. Halstead admitted to serving time in Leavenworth for desertion from the armed forces. He admitted to convictions for the crimes of murder and burglary. He admitted that he doesn't pay income taxes on some of his earnings. Prior to trial Odis Halstead gave a different version of the accident. Tr. 104. At trial, the driver of the lead vehicle gave a different version of the accident (Tr. 274, 275), the investigating officers gave a different version of the accident (Tr. 190, 199) and decedents' death certificates (Tr. 34, 35) also explain the accident as having occurred in a manner different from Halstead's version which has been accepted as the basis for this decision. Manifest error has been established to my satisfaction.
If the accident occurred while decedents were attempting to attach a chain, the chain should have been shown in one of the numerous photographs taken at the scene of the accident. These photographs show the back of the lead vehicle and the front of the pickup truck. There is no sign of a chain. But these photographs do show a transmission on the surface of the bridge and the damage to the pickup truck and lead vehicle could not reasonably be expected to knock the transmission off the pickup truck.
It is a remarkable coincidence that decedents repaired the pickup truck transmission in Orange, Texas, had to stop on the bridge because of transmission trouble, and a transmission is found beside the body of one of the decedents (P-22, 23) immediately after the accident. The pickup truck's transmission broke down on the trip from Pasadena, Texas and had to be repaired in Orange, Texas. Decedents made no effort to get a qualified mechanic to repair the transmission but undertook to make the repairs themselves. When the repairs were completed to decedents' satisfaction, the battery in the pickup truck did not have a sufficient charge to start the truck. The pickup truck (with the black trailer in tow) had to be towed onto the highway when the caravan departed Orange, Texas.
It is reasonable to conclude that decedents were under the pickup truck attempting to complete transmission repairs which they started in Orange, Texas. If that be *275 true, decedents were negligent for attempting to repair the disabled truck while it was blocking one of the only two westbound Interstate 10 bridge lanes on a foggy dark night. The thought also occurs that decedents were negligent for putting the disabled pickup truck on the road.
If decedents were not under the pickup truck repairing the transmission, then the evidence preponderates that they were walking alongside the caravan as it crept up the I10 bridge. Excepting for Odis Halstead's trial testimony decedents' relatives and friends uniformly gave this version. Under these facts, decedents were negligent and that negligence was a legal cause of the accident.
Decedents knew that for a period of between 10 and 15 minutes they were blocking one-half of the two heavily traveled westbound lanes across the unlighted Interstate 10 bridge while visibility was substantially obscured. They knew that the rear vehicle was painted black. They knew that they had a low charge in the battery and that there were no flashers to blink both taillights even if there was sufficient power. They knew they didn't have warning flares to post. They had ample manpower and a flashlight available for use to warn overtaking traffic, but made no effort to post a warning.
I hold to the view that when persons find themselves in a condition of extreme peril they are under a duty to take steps to assure their own safety. The duty to provide for one's own safety is not entirely delegable. These decedents were bound to use their available resources to warn overtaking traffic. Furthermore it was established that the numerous passengers in the vehicles were only slightly injured and it appears unlikely decedents would have been seriously injured had they been in either of the moving vehicles. There appears in the record no justifiable reason for them to walk alongside the moving vehicles.
Decedents failed to exercise ordinary care when they walked alongside this peculiar caravan moving slowly up the Interstate Highway bridge on a foggy night.
There are two other relevant findings by the trial court that appear to me to be manifestly erroneous. First, the finding that the taillights of the black trailer were functioning at the time of the accident. Second, the finding that the tractor-trailer unit struck the center median of the bridge at a point some 92 feet prior to the point of impact.
The majority finds no evidentiary support for defendants' contention that the taillights of the black trailer were not functioning at the time of the accident other than Saliba's failure to see them. They fail to note that the pickup truck's battery was so discharged that it would not start the pickup truck when the caravan left Orange, Texas some 30 miles from the site of the accident. It has been suggested that the battery was charged during that 30 mile trip, but this ignores the fact that the caravan traveled at least twice that far before having to stop in Orange, Texas to repair the pickup truck's transmission. Although the taillights were repaired at Orange, a charged battery is required to power the lights. When the pickup truck left Orange, Texas it was in tow. There is no credible evidence that the taillights on the black trailer were sufficiently powered to warn overtaking traffic. Furthermore, there is no suggestion that the taillights were blinking a warning, this notwithstanding testimony that the pickup truck was equipped with a turn signal indicator.
In my view, Saliba was not shown to be traveling at such an excessive rate of speed as to render the necessary warnings futile.[1] The majority has not specifically ruled on the trial court's finding that Saliba *276 was traveling about 50 mph when he first saw the (unlighted) black trailer. I submit that Saliba's estimate of 40 mph is well supported.
The statement that the tractor-trailer unit struck the center median of the bridge at a point some 92 feet prior to the point of collision is (I submit) wrong on two counts. First (and the majority may agree), the trailer never struck the center concrete barrier. The photographs establish that the trailer (which was carrying the majority of the 40,000 pound load) never reached the concrete barrier. The long trailer came to rest in the direction of its prior movement with only two-thirds of its width in the passing lane and one-third remaining in the slow moving traffic lane. P-28 shows almost no damage to the front of the overtaking tractor cab. The headlights are not damaged. The photographs show that only the left front of the tractor cab struck and drug along the center concrete barrier. That occurred after the tractor jackknifed and the momentum of the heavily loaded trailer drug the cab along the barrier. P-28 shows only brush marks along the left front bumper as the damage to the front of the overtaking tractor. Secondly (and the majority differs), I submit that the record only suggests (but DOES NOT ESTABLISH) that the markings on the center concrete barrier were located 92 feet before impact. The investigating officer testified (Tr. 185) that the overtaking rig "struck the inside railing approximately 92 feet before he got to the accident. He traveled against the railing for approximately 60 feet, leaving the railing and traveling another 32 feet and then striking the vehicles." There is no evidence to indicate that the officer distinguished between the point where the vehicles came to rest after impact and the point of impact. If the officer intended to distinguish these two points, he failed to measure and/or indicate the distance the vehicles traveled after impact.
The leading edge of the right front of defendant's trailer struck the rear of the black Nationwide trailer van. This impact may have occurred 60 feet from the point where the left front bumper of the Saliba's tractor lightly scraped the center concrete barrier and after the tractornot the trailerjackknifed. The photographs indicate that the vehicles came to rest about 32 feet after impact. Saliba reacted to the sudden emergency by turning left too quickly which in turn caused his rig to jackknife and drag his cab along the center barrier.
Finding manifest error in the conclusion that decedents were free from contributory negligence, I respectfully dissent to that part of the judgment awarding damages for their wrongful death.
NOTES
[1] The trial judge felt that Saliba's negligence was the sole proximate cause. We disagree for reasons that will be pointed out later.
[1] The trial court's reference to the successful diversion of four other vehicles into the passing lane is unsupported by credible evidence. There is no indication in the record that these vehicles approached in the right or outside lane and were diverted to the passing lane.